IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AUDREY L. KUNTZLER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:06-CV-0741-JOF |
| BELLSOUTH SHORT TERM | : | |
| DISABILITY PLAN, | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

This matter is before the court on Defendant's motion for summary judgment [5-1] and Plaintiff's cross-motion for summary judgment [7-1].

I.    **Background**

A.    **Procedural History and Facts**

Plaintiff, Audrey Kuntzler, filed suit against Defendant, The BellSouth Short Term Disability Plan, on March 30, 2006, pursuant to the Employment Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. §§ 1132 *et seq.*, alleging that the Plan improperly denied her short-term disability benefits during a period from June 16, 2004 to August 15, 2004.

The BellSouth Short Term Disability Plan delegates to Broadspire Services, Inc., the responsibility of administering claims under the Plan.  The Plan states that Broadspire is "the named fiduciary under the plan with complete authority to review all denied claims for benefits in exercising such fiduciary responsibilities.  [Broadspire] shall have discretionary authority to determine whether or to what extent participants are eligible for benefits and to construe disputed or doubtful plan terms."  *See* Summary Plan Description, at 10.

The Plan defines "disability" as follows:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury.  "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties.  "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions.  A Participant subject to a Disability is referred to as being "Disabled."

*See* The Plan, at 2.

First Short-Term Disability Absence

Plaintiff is an Office Assistant at BellSouth and has worked at the company for 35 years.  In 1995, Plaintiff began suffering from depression and having nightmares after watching a film about sexual molestation.  Plaintiff indicates she was sexually molested by her older brother from age 9 to age 26, and the film reminded her of this experience.  At the time, Plaintiff began counseling and taking the drug Serozone.  In 1997, Plaintiff was placed

2

on medical leave when she was hospitalized for suicidal ideation. In October 2003, Plaintiff was placed on a different medication which caused nightmares. She found it difficult to get out of bed and started calling in sick to work.

On March 13, 2004, Plaintiff was on medical leave and made a claim for short-term disability benefits due to her depression and because her suicidal ideations had increased. At that time, she entered a daily outpatient program at The Hope Center where she was treated by Ms. Bonnie Noyes, a therapist. On April 9, 2004, Broadspire made an initial determination that Plaintiff was not eligible for short-term disability benefits. Plaintiff appealed this decision. On April 22, 2004, Dr. David Rush conducted an in-person psychological evaluation of Plaintiff. Dr. Rush recorded a number of findings, including a conclusion that Plaintiff suffered from major depressive disorder.

Dr. David Markwell, a therapist, completed an assessment of Plaintiff on April 26, 2004. He found that she had problems with isolation, self worth, tearfulness, poor concentration, loss of energy, thought of harm to self, fear, sadness, and dizziness. While Plaintiff had acceptable cognitive functioning, Dr. Markwell concluded that she suffered from depression and anxiety and several social, relational and occupational stresses. Dr. Markwell calculated that Plaintiff had a Global Assessment of Functioning of 50. A Global Assessment of Functioning of 50 indicates a serious impairment in social, occupational, or school functioning.

AO 72A
(Rev.8/82)

On May 18, 2004, Dr. Lawrence Burstein conducted a peer review based on a voicemail from Ms. Noyes, a review of an evaluation from one of Plaintiff's physicians, and Dr. Rush's report. Dr. Burstein concluded that Plaintiff's cognitive function was sufficiently intact to perform work and she generally displayed emotional control. However, Plaintiff did have significant behavioral impairments surrounding her lateness, poor eye contact, poor hygiene, slow responses and frustration with stress. Because of these behavioral problems, Dr. Burstein recommended that she could not perform work and should receive short-term disability benefits. Plaintiff received those benefits and returned to work full time on May 16, 2004 in accordance with a plan set out by her physician.

Second Short-Term Disability Absence

On June 8, 2004, Plaintiff informed her therapist, Dr. Markwell, that she was extremely depressed and had self-injury ideations. She was immediately taken to the Paulding County Wellstar hospital emergency room and was then transferred to Cobb General for psychiatric care. Dr. Markwell stated, "upon her release from the hospital unit, it was impossible for her to continue any work related or socially related activities for an indefinite period of time."

Plaintiff's first day of absence from work was June 11, 2004. Plaintiff filed a claim for benefits on June 17, 2004, after the seven-day waiting period required under the Plan. In her claim, Plaintiff noted that she had been hospitalized and her depression had relapsed.

4

From June 10, 2004 through June 22, 2004, Plaintiff participated in out-patient therapy sessions at the Hope Day Program. (It is not clear from the administrative record for how long Plaintiff was hospitalized before beginning outpatient treatment.)

Plaintiff met with Dr. Asaf Aleem for therapy sessions, and he continued the process of adjusting her medication. On June 24, 2004, Dr. Aleem evaluated Plaintiff as depressed with difficulty concentrating and fragile, tearful, afraid of people, stressed. He determined that she could not return to work. (The court notes that Plaintiff references an April 26, 2004 evaluation by Dr. Aleem at Administrative Record 330-335. That evaluation, however, was completed by Dr. Markwell and is in reference to Plaintiff's first disability absence.)

Dr. Markwell submitted a Behavioral Health Clinician Statement on June 28, 2004. He observed that Plaintiff's cognitive function appeared to be acceptable, but that Plaintiff's behavioral and emotional functioning, through extreme sadness, depression, outburst of tears, thoughts of hopelessness, agoraphobia, anxiety and panic, precluded Plaintiff from performing work. He recommended that Plaintiff stay at home but that she could possibly transition into half days and then full days at work. *Id.* at 099. Dr. Markwell calculated a Global Assessment of Functioning of 60. *Id.*

On July 1, 2004, Broadspire sent Plaintiff a letter informing her that her claim had been denied. Broadspire informed Plaintiff that in accordance with the definition of

"disability" in the Plan, Plaintiff had to submit "objective data [establishing] inability to work <u>any</u> job" in order to be eligible for benefits. *Id.* at 214. The Claims Examiner indicated she had received the Mental Health Assessment from Dr. Mark[well]. "The functional indicators in the areas of cognitive, emotional and behavioral functioning fail to clinically substantiate that you are unable to perform any type of work, with or without appropriate medical restrictions." *Id.* The letter suggested relevant information might include "a full Mental Status Exam, Global Assessment of Functioning (GAF), observable findings, psychological testing and/or any progress notes from your office visit or any hospitalization records." *Id.*

On July 8, 2004, Dr. Aleem's records indicate that Plaintiff was sad, depressed, anxious, lethargic, was not leaving her house, and was only showering one to two times per month. In his July 20, 2004 Behavioral Health Clinician Statement, Dr. Aleem indicated that Plaintiff could not perform work. He projected that Plaintiff would be able to return to work on August 31, 2004. *Id.* at 221. He indicated that Plaintiff was out of work because she was "fragile emotionally, had poor concentration and was depressed." *Id.* at 318. She was able to write a sentence from dictation, follow a three step command, and had an attention span greater than 50 minutes. Dr. Aleem stated that Plaintiff was "too sensitive" when she was in public and had some paranoia in public. She felt that other people were

talking about her. There was some delusional ideation, but no hallucinations. She was anxious and wanted to leave the office.

Dr. Aleem's notes from a July 15, 2004 therapy session indicate that Plaintiff wanted to sleep all the time, felt overwhelmed, wished she would die, had suicidal ideation, was depressed, anxious, and lethargic. On August 5, 2004, Dr. Aleem noted that with a change in medication, Plaintiff began to feel better, but she still exhibited signs of irritability, anxiousness, and she felt lethargic. After another session on August 12, 2004, Dr. Aleem released Plaintiff to return to work on August 16, 2004 on a part-time basis for two weeks followed by full-time work.

Plaintiff requested a first level appeal of the Plan's denial of her claim for short-term disability benefits. As a result, on August 21, 2004, Plaintiff underwent an independent medical examination with Dr. Michael McGarry, a psychologist. Dr. McGarry concluded that there "were no difficulties with respect to eye contact, hygiene, or communication skills." *See* Administrative Record, at 185. "There was no significantly noticeable difficulty around psychomotor activity, and only mild difficulties with emotional discontrol." *Id.* Dr. McGarry said that Plaintiff was "able to report her situation accurately." *Id.* at 180. Plaintiff did not "demonstrate any clinically significant behavioral impairments. *Id.* at 185. Dr. McGarry reported that there was "no evidence of formal thought disorder by Plaintiff and that Plaintiff denied having any current or past homicidal ideation or intent or history

7

of violent behavior." *Id.* at 180, 185.  (There appears to be a conflict between Dr. McGarry's interpretation of Plaintiff's records and Dr. Markwell's.  Dr. Markwell reported suicidal ideations in June 2004.  However, Dr. Markwell's evaluation appears to indicate that he was remarking on Plaintiff's reports of suicidal ideations during the first disability leave and not current ideations).

On September 3, 2004, Dr. Alana Mendelssohn conducted a peer review of Plaintiff's file.  She concluded that there were "no examination findings . . . submitted to substantiate the presence of cognitive defects." *Id.* at 188.  Dr. Mendelssohn noted that Plaintiff's treating physician Dr. Markwell stated that Plaintiff was able to "clean her home, shop, and drive independently." *Id.*  She recognized that Plaintiff's other treating physician, Dr. Aleem, found that Plaintiff had "mild social anxiety and no prolonged tolerance for stress." *Id.*  Dr. Mendelssohn concluded, however, that Dr. Aleem did not "provide examination findings to substantiate his clinical opinion," and he did not "submit [Plaintiff's] treatment notes or formal psychiatric examination." *Id.* at 188.

Plaintiff returned to work on August 16, 2004, and assumed a full schedule on August 30, 2004.

Plaintiff's first-level appeal was denied on September 13, 2004.  In a letter informing Plaintiff of the decision, the appeals coordinator wrote that a review had been conducted of Plaintiff's file, including medical information from Dr. Markwell, Dr. Aleem, and an

8

independent assessment by Dr. McGarry. "The medical data received indicated diagnoses of major depressive disorder and anxiety." *Id.* at 234. Dr. Markwell's notes from the June 14, 2004 visit indicated that "you were able to follow a three step command, respond appropriately to direct questions, and [] apply focus and concentrate for 30 to 50 minutes during a session." *Id.* The letter also noted that Dr. Aleem determined on July 8, 2004, that Plaintiff was "able to perform serial numbers, perform routine shopping, and pay your bills." *Id.* Based on these findings from her treating physicians, the Plan informed Plaintiff that her "providers have not given us objective medical data to suggest your being 'disabled' from any type of work." *Id.*

Dr. Markwell sent a letter on September 29, 2004, indicating that Plaintiff had exhibited symptoms of depression since he began treating her in April 2004. She had been hospitalized on June 8, 2004, and had been unable to work.

Plaintiff filed a second-level appeal on January 24, 2005, with additional medical documents. On March 28, 2005, Broadspire asked Barry Glassman, MD (psychiatrist), to perform a second peer review. Dr. Glassman did not examine Plaintiff but reviewed all of the documents in Plaintiff's administrative file. Dr. Glassman concluded: "[T]he submitted documentation, while indicating that claimant did experience some symptoms of anxiety and depression, had failed to provide examination data that would support a functional impairment in the cognitive, behavioral or emotional spheres that would preclude this

9

claimant from performing the core elements of any work [during the time she was off from work and expecting disability benefits]." *Id.* at 325.  Dr. Glassman reported that Drs. Markwell and Aleem had "failed to provide exam data that would support functional impairment from a psychiatric perspective." *Id.* at 323, 324, 325.  Dr. Glassman did not believe that Plaintiff suffered from disabling panic attacks based on the description made by Dr. Markwell. *Id.* at 323-24.  Dr. Glassman further stated that Plaintiff's "reports of self-activities of maintaining her residence, operating a motor vehicle, performing routine shopping and paying bills" were inconsistent with a functional impairment that would preclude her from performing the core elements of any occupation. *Id.* at 324.

On April 27, 2005, Broadspire asked Dr. Lawrence Burstein, a psychologist, to perform a third peer review on Plaintiff's file.  Dr. Burstein held a peer-to-peer conference with Dr. Aleem.  Dr. Burstein reported that Dr. Aleem was not able to identify any particular examination records of Plaintiff's to support his opinion that she was disabled.  He also could not provide examples of Plaintiff's behavior to show she was not able to return to work.  Dr. Burstein concluded that the information in Plaintiff's file did not support a functional impairment that would have precluded Plaintiff from working during the claim period. *Id.* at 326-28.  Broadspire upheld its denial of Plaintiff's short term disability claim. *Id.* at 316-20.

On April 27, 2005, Broadspire wrote Plaintiff to tell her that her second-level appeal had been denied.  The appeals coordinator indicated that the Plan had reviewed new information provided by Plaintiff including a Behavioral Health Clinician Statement filled out by Dr. Markwell on June 14, 2004, in which Dr. Markwell indicated that he took Plaintiff out of work because she could not complete her daily routine.  *Id.* at 317.  The Plan determined, however, that

> [u]nder cognitive functioning, he indicated you were able to write a sentence from dictation, follow a three-step command, read a newspaper or magazine and report the main concepts, do serial 7s, recall 4/4 unrelated words after 5 minutes, and had an attention span of 30 to 50 minutes.  He indicated that your reasoning and judgment were impaired and by that he meant "severe thoughts of hopelessness and panic."  There were delusions or hallucinations. Under emotional functioning, you were described as extremely sad and depressed.  He indicated that you were having panic attacks, which were symptomatically described as social phobia and agoraphobia.  This was not an accurate description of a panic attack and did not describe it as disabling panic attack. Under Behavioral Observations, your Psychomotor activity was marked as impaired and he stated "difficulties to stay focused on task."  No examination data was provided to support that statement.  Dress and hygiene were appropriate.  You were described as having a heavy outburst of tears, occasionally, and your speech was described as soft.  You reported self-activities of maintaining your residence, operating a motor vehicle, performing routine shopping and paying bills.  The form failed to describe a functional impairment that would have precluded you from performing the core elements of any occupation.

*Id.* at 317.  The letter also indicated that a June 24, 2004 report of visit provided no "evidence of functional impairment."  The report found the same for Dr. Aleem's July 8, 2004 and August 5, 2004 assessments.

11

The appeals coordinator also noted that Dr. Markwell's letter of September 29, 2004, had not provided any "examination data that would support a functional impairment." *Id.* at 318. During the peer-to-peer interview, Dr. Aleem offered the opinion that Plaintiff was too depressed during the relevant time period to work, but

> [T]his was not supported by the submitted notes and Dr. Aleem was unable to provide any specific examples of your behavior from that time period or measurements of your functioning to document that you would have been incapable of performing work. Therefore, it remains unsubstantiated that you would have been unable to perform the core elements of any occupation from June 16, 2004 through August 15, 2004.

*Id.* at 318-19.

The letter concluded:

> [T]he submitted documentation, while indicating that you did experience some symptoms of anxiety and depression, have failed to provide examination data that would support a functional impairment in the cognitive, behavioral or emotional spheres that would have precluded you from performing the core elements of any occupation from June 16, 2004, through August 15, 2004.

*Id.* at 319. After receiving the Plan's denial of her second-level appeal, Plaintiff then filed the instant ERISA action.

**B.      Contentions**

Plaintiff argues that it was arbitrary and capricious for the Plan (1) to conclude that there was no objective medical evidence in the administrative record that supported Plaintiff's request for short-term disability benefits, (2) to ignore the observations of those doctors who actually treated Plaintiff in favor of three doctors who merely reviewed

12

Plaintiff's paper file, and (3) the Plan language does not exclude employees from coverage if they are able to perform any type of work.  Finally, Plaintiff argues that she had already been identified as disabled due to her depression and behavioral impairment during her first short-term disability absence, and it was arbitrary and capricious for the Plan to determine that in spite of her relapse, she was no longer disabled under the Plan.  Defendant responds that it denied Plaintiff's short-term disability benefits claim because the medical evidence submitted on Plaintiff's behalf failed to support a finding of "disability" as defined in the Plan.

**II.    Discussion**

In *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), the court set forth the procedure to be followed in reviewing a denial of benefits claims under ERISA plans.

(1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

13

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.* at 1137-38; *see also Wangenstein v. Equifax, Inc.*, 191 Fed. Appx. 905 (11ᵗʰ Cir. 2006) (unpublished decision).

Neither party has presented any evidence addressing whether Broadspire operates under a conflict of interest.  Intriguingly, Plaintiff asserts the "Defendant has made no showing that the administrator of the Plan does not operate under a conflict of interest and the Court may conclude that the 'heightened arbitrary and capricious standard' is the correct standard of review."  *See* Plaintiff's Cross-Motion, at 18.  Unsurprisingly, Plaintiff cites no law supporting this novel proposition.  The claimant bears the burden of proving her entitlement to contractual benefits.  *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11ᵗʰ Cir. 1998).  Thus, the court may not simply presume that a conflict of interest exists.  Because Plaintiff has presented no evidence on this issue, the court finds there is no conflict of interest and will apply the ordinary arbitrary and capricious standard.

Of further significance to the issues here is the Supreme Court's decision in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).  There, the Court considered the weight that a plan should accord the statements of a claimant's treating physician.  The Court instructed that "courts have no warrant to require plan administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose

14

on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.   However, plan administrators also may not "arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Id.*

In making the first *Williams* determination of whether the Plan's decision was "wrong," the court finds the circumstances here similar to those of *Wangenstein v. Equifax, Inc.*, 191 Fed. Appx. 905 (11th Cir. 2006) (unpublished decision).   There, the plaintiff had been granted long-term disability benefits for the two-year period that covered when she was unable to perform her own occupation due to spinal problems and migraine headaches. After that two-year period expired, under the terms of the Plan, the plaintiff would have to show she was disabled from performing *any* occupation.   The plaintiff's own physician submitted documentation with his conclusion that the plaintiff could not perform any occupation.   The Plan determined that the plaintiff had not submitted any "objective evidence" of her conditions and had a peer review performed.   The physician completing the first review concluded there was no objective evidence in the plaintiff's file that she could not perform any job.   A second neurologist completed a peer review and concluded that the "record failed to support functional impairment that precluded work."   The plaintiff's physician responded to the Plan's denial of benefits by stating that there was no diagnostic tool that could support his opinion about the plaintiff's condition due to the nature

15

of that condition. As a result, the Plan denied the plaintiff's claim for disability benefits. The district court held that the Plan's determination was not wrong.

On appeal, the United States Court of Appeals for the Eleventh Circuit affirmed the district court's ruling, rejecting the plaintiff's argument that her physicians stated she was disabled due to her migraines and that there could be no objective diagnostic tools for the migraines other than the patient's own history. The Court of Appeals noted that it was not only the plaintiff's physicians who provided an opinion. "Four other doctors performed paper reviews of Wangenstein's files, and all concluded that the evidence did not establish that Wangenstein was disabled from performing any occupation." *Id.* at 911. The Court of Appeals rejected the plaintiff's argument that more weight should be accorded to her treating physicians because they actually examined her, rather than simply reviewed her medical records. *Id.* at 912. Citing *Black & Decker*, the court noted that "the administrator did not arbitrarily refuse to credit the opinions [of plaintiff's treating physicians], but rather accorded greater weight to the conflicting opinions" of the doctors who conducted peer reviews. *Id.* at 913.

Here, the Plan defines disability as "a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury." Plaintiff contends that the Plan language does not unequivocally exclude employees from eligibility if they are able to perform any type of work. *See* Plaintiff's

16

Cross-Motion, at 24.  "Defendant is absolutely incorrect when it implies that if Plaintiff could work part-time, she was not disabled under the Plan." *Id.*  "The Plan stated the exact opposite – that is the Plan only requires Plaintiff to show that she was unable to perform any type of work with the Defendant, not that there were no jobs with the Defendant that she could perform." *Id.*  It is not clear to the court what distinction Plaintiff attempts to make.  The court need not speculate as to what "any type of work" means.  The Plan, itself, defines that term as "the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties."  This language is unambiguous and straightforward.  It means that Plaintiff must show she cannot perform any work.  Thus, if Plaintiff could work with an accommodation, such as working part-time, she would not be disabled under the Plan.  Plaintiff's arguments to the contrary are unavailing and unsupported by the plain language of the Plan.[1]

Plaintiff's own therapist, Dr. Markwell, indicated on June 28, 2004, that Plaintiff would be able to return to work part-time and then progress to full days.  This assessment alone precludes Plaintiff from coverage under the Plan's disability clause.  In addition, the

---

[1]Plaintiff further misinterprets Dr. Burstein's comments from her first period of disability.  There, in agreeing that Plaintiff was disabled, he concluded that her cognitive functioning was sufficient to allow her to perform work, but that her behavioral functioning was not sufficient.  Thus, as a whole, he determined that she was disabled from working.  This is not a finding by Dr. Burstein that Plaintiff's disability was not "completely debilitating."  *See* Plaintiff's Cross-Motion, at 25.

17

evaluations of Dr. McGarry, a psychologist who performed an independent medical examination on Plaintiff, Dr. Mendelssohn, a clinical neuro-psychologist, Dr. Glassman, a psychiatrist, and Dr. Burstein, a psychologist, all indicate that there was not sufficient information in Plaintiff's record to show a functional impairment that would have prevented Plaintiff from working between June 18, 2004 and August 15, 2004. While it is true that one of Plaintiff's treating physicians, Dr. Aleem, opined that she could not work during the relevant time period, it is not "wrong" of the Plan to give greater weight to the statements of Dr. Markwell and the other medical reviewers, particularly where the Plan did not ignore Dr. Aleem's opinion but rather addressed what it perceived to be its shortcomings.

The only information that might give the court pause as to whether the Plan's determination was "wrong" is the Global Assessment of Functioning score Dr. Markwell recorded on June 14, 2004. He found Plaintiff had a functioning of 60 which indicates moderate symptoms in social, occupational, or school functioning. The Global Assessment of Functioning is one of the objective tests that the Plan recommended Plaintiff secure in order to more fully support her disability claim. It is not clear from the later medical assessments that anyone considered the Global Assessment of Functioning score in further decisions to deny Plaintiff disability benefits. However, in light of the other information in Plaintiff's file and the other reasoning the reviewing physicians gave for recommending a denial of benefits, the court does not find that this one test would render the Plan's decision

"wrong," particularly where Plaintiff does not offer any evidence to show that a score of 60 would preclude her from performing any work.

Furthermore, the court has not located any cases – and Plaintiff has not pointed the court to any – which support her contention that Broadspire's representatives should have considered Plaintiff's short term disability file from her first disability absence. Plaintiff had returned to full duty when she had what she describes as a "relapse." It is true that only a short period of time elapsed between Plaintiff's return to work on May 16, 2004 and her hospitalization on June 8, 2004, however, the court cannot find that Broadspire was "wrong" to treat the hospitalization on June 8, 2004, as a new short-term disability episode. Thus, the court disagrees with the manner in which Plaintiff has conflated the two separate periods of disability. Records from Plaintiff's first disability period cannot be used to sustain an argument for disability during the second period. Those physicians who reviewed Plaintiff's administrative record from the first disability period concluded that she had provided sufficient objective evidence of disability to satisfy the terms of the Plan. The fact that physicians (including Dr. Burstein, who participated in the first review) reviewing Plaintiff's records from the second disability period reached a different conclusion does not mean that those doctors have had a "complete change of opinion." *See* Plaintiff's Cross-Motion, at 23. Rather, the second period of disability is a different set of circumstances from the first.

19

Even if the court were to conclude that Broadspire was wrong in finding that Plaintiff was not entitled to short-term disability benefits, because Broadspire was granted discretion in making disability determinations, the court would next consider whether Broadspire's decision was arbitrary or capricious. "A decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision." *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997). *Wangenstein* demonstrates that placing greater reliance on its own peer reviewers rather than Plaintiff's treating physicians is not "no reasonable basis" for denying disability benefits, so long as the Plan does not ignore the opinions of the treating physicians. Furthermore, the court holds that determining that the first period of disability is distinct from the second period of disability is not unreasonable. Thus, the court concludes that the Plan's determination that Plaintiff was not disabled during the time period of June 8, 2004 through August 16, 2004 was not "wrong," and even if it were "wrong" it was not arbitrary and capricious.

**III.    Conclusion**

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment [5-1] and DENIES Plaintiff's cross motion for summary judgment [7-1].

The Clerk of the Court is DIRECTED to DISMISS with PREJUDICE Plaintiff's complaint.

AO 72A
(Rev.8/82)

**IT IS SO ORDERED** this 18th day of September 2007.


　　　　　　　　　　　　　s/ J. Owen Forrester
　　　　　　　　　　　　J. OWEN FORRESTER
　　　　　　　　SENIOR UNITED STATES DISTRICT JUDGE

21

AO 72A
(Rev.8/82)